UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
ALEXANDER REDDINGER  :  3:18 CV 924(RMS)
:
V.  :
:
ANDREW M. SAUL, COMMISSIONER  :
OF SOCIAL SECURITY[1]  :  DATE: JUNE 18, 2019
:
------------------------------------------------------ x

## RULING ON THE PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff disability insurance benefits ["SSDI"].

I. ADMINISTRATIVE PROCEEDINGS

On January 5, 2015, the plaintiff filed an application for SSDI claiming that he has been disabled since December 29, 2014 due to a combination of medical conditions collectively referred to as "VATER Syndrome,"[2] acute lymphoblastic leukemia, in remission, bladder dysfunction and neurogenic bladder.[3] (Certified Transcript of Administrative Proceedings, dated July 22, 2018

---

[1] The plaintiff commenced this action against Carolyn Colvin, as Acting Commissioner of Social Security. (Doc. No. 1). On January 21, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security, and on June 17, 2019, Andrew M. Saul became the Commissioner of Social Security. Because Carolyn Colvin was sued in this action only in her official capacity, Andrew M. Saul is automatically substituted for Carolyn Colvin as the named defendant. *See* FED. R. CIV. 25(d). The Clerk of the Court shall amend the caption in this case as indicated above.

[2] VATER syndrome is an acronym used to describe a series of birth defects that often occur together. V stands for vertebrae; A stands for imperforate anus or anal atresia, or an anus that does not open to the outside of the body; C stands for cardiac anomalies; TE stands for tracheoesophageal fistula, which is a persistent connection between the trachea and the esophagus; R stands for renal or kidney anomalies; and L stands for limb anomalies. https://www.cincinnatichildrens.org/heath/v/vacterl (last visited May 15, 2019).

[3] Neurogenic bladder is bladder dysfunction caused by a brain, spinal cord, or nerve condition. https://medlineplus.gov/ency/article/000754.htm (last visited May 15, 2019).

["Tr."] Tr. 216; *see* Tr. 226). The plaintiff's application was denied initially and upon reconsideration (Tr. 166-69, 172-74), and on June 20, 2017, a hearing was held before ALJ Eskunder Boyd at which the plaintiff and a vocational expert testified. (Tr. 112-42). Ten days later, on June 30, 2017, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits (Tr. 13-25), and, on July 10, 2017, the plaintiff filed a request for review of the hearing decision. (Tr. 6; *see* Tr. 8-9). On April 4, 2018, the Appeals Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-4).

On June 4, 2018, the plaintiff filed his complaint in this pending action (Doc. No. 1), and on June 14, 2018, the parties consented to the jurisdiction of a United States Magistrate Judge, and this case was transferred to this Magistrate Judge. (Doc. No. 15). On August 10, 2018, the defendant filed her answer and the administrative transcript, dated July 22, 2018. (Doc. No. 15). On October 9, 2018, the plaintiff filed his Motion for Judgment on the Pleadings (Doc. No. 19), with Statement of Material Facts (Doc. No. 20), and brief in support (Doc. No. 21 ["Pl.'s Mem."]). On December 10, 2018, the defendant filed her Motion to Affirm (Doc. No. 22), and brief in support (Doc. No. 22-1 ["Def.'s Mem."]). On December 19, 2018, the plaintiff filed a reply brief. (Doc. No. 23).

For the reasons stated below, the plaintiff's Motion for Judgment on the Pleadings (Doc. No. 19) is *granted in large part such that this case is remanded for further proceedings consistent with this Ruling*, and the defendant's Motion to Affirm (Doc. No. 22) is *denied in large part and granted in limited part.*

II. FACTUAL BACKGROUND

   A. MEDICAL RECORD

The Court presumes the parties' familiarity with the plaintiff's medical history, which is

discussed in the Stipulation of Facts (Doc. No. 20). Though the Court has reviewed the entirety of the medical record, it cites only the portions of the record that are necessary to explain this decision.

B.  HEARING TESTIMONY AND NON-MEDICAL EVIDENCE

On the date of the hearing in June 2017, the plaintiff was 23 years old, and he was living with his mother. (Tr. 87, 90, 118). The plaintiff held seasonal jobs from September 2012 through December 2014 as an electrician apprentice, stock clerk, delivery helper, and delivery driver. (Tr. 95; *see* Tr. 96-101). The plaintiff explained that his last job, as an electrician apprentice, ended because the plaintiff had to take off so much time. (Tr. 121). In 2016, the plaintiff worked briefly at Vitamin World, but he "had too many accidents" and had to take "a lot of time off work." (Tr. 129). He worked for a temporary placement service but had to stop working when he was hospitalized with a bladder infection. (Tr. 130). Additionally, he worked briefly for a collection agency, but had an "accident in [his] pants and . . . walked home." (Tr. 131).

The plaintiff described his condition as a "life long illness, that became an issue once [he was] out of school and entering the workforce. [He does] not have bowel control, now [his] bladder is failing. [He] need[s] to be close to a rest room at all times. [He has] accidents." (Tr. 88). His daily routine includes irrigating his stool, which takes about an hour-and-a-half to two hours, and cleaning a catheter, which he does every one-to-three hours. (Tr. 127). The irrigation involves "a lot of solutions and supplies and tubes[,]" so it is something that the plaintiff must do at home. (Tr. 131-32). If he has an accident during the day, which he said he has "[f]requently[,]" he must irrigate again. (Tr. 126, 132).

As a result of having to use a catheter, the plaintiff gets "a lot of infections in [his] bladder." (Tr. 128). In 2015, he underwent surgery that improved his ability to empty his bladder completely. (Tr. 126).

In addition to his incontinence issues, the plaintiff reported that he is limited by his "back issues[.]" (Tr. 88). His "back issues do not allow [him] to do the climbing, crawling, bending[, or] lifting involved in any of the jobs [he] . . . attempted." (Tr. 88). According to the plaintiff, he would like to return to school and "perhaps pursue a degree that would allow [him] a career [he] could do from home." (Tr. 91).

The vocational expert testified that an individual limited to light work, who can never climb ladders, ropes or scaffolds, but can occasionally climb stairs and ramps, balance, stoop and crouch, but can never kneel or crawl, could not perform the past work performed by the plaintiff. (Tr. 134). An individual with those limitations, however, could perform the work of a laundry worker, a production assembler, or a small parts assembler. (Tr. 134-35). If such a person also took the normal breaks of a fifteen-minute morning break, a half hour lunch break, and a fifteen-minute afternoon break, such a person could perform those jobs. (Tr. 135-36). If a person needed a two-to-three-minute break every three hours, in addition to the customary break periods, that would be an "accommodation" that would not impact the person's overall ability to perform a certain job. (Tr. 136). If a person was subject to "unpredictable breaks or absences[,]" the job would not be affected if the break was only one or two minutes, but, if the person was off-task for ten percent of the time or his "productivity got [ten] percent or more below the expected norm because of these incidences, he would be terminated fairly quickly[.]" (Tr. 137). Additionally, work would be precluded if, in addition to being absent two days or more, the person was more than an hour late or needed to leave work an hour or more early, twice each month. (Tr. 139).

4

III. THE ALJ'S DECISION

Following the five-step evaluation process,[5] the ALJ found that the plaintiff met the insured status requirements through June 30, 2016 (Tr. 18), and that the plaintiff did not engage in substantial gainful activity during the period from his alleged onset date of December 29, 2014, through his date last insured of June 30, 2016. (Tr. 19, citing 20 C.F.R. § 404.1571 *et seq.*).

At step two, the ALJ concluded that the plaintiff had the severe impairments of spinal scoliosis, VATER syndrome, status post cystourethroscopy with placement of suprapubic tube, and neurogenic bladder[6] (Tr. 19, citing 20 C.F.R. § 404.1520(c)), but that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 19-20, citing 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). Specifically, the ALJ concluded that the plaintiff's back condition did not meet Listing 1.04 (Disorders of the Spine), and that the plaintiff's VATER syndrome, status post cystourethroscopy with placement of suprapubic tube and neurogenic bladder, did not meet Listing 5.06 (Inflammatory Bowel Disease). (Tr. 19).

---

[5] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. § 404.1520(a). First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

[6] Dr. Shumlye Alam diagnosed the plaintiff with a neurogenic bladder in August 2014 (Tr. 523; *see* Tr. 553-54, 581-82, 880-81) and evaluated the plaintiff for a "Malone procedure" in September 2014. (Tr. 524, 555, 573, 882; *see also* Tr. 578-80). A Malone procedure or Malone appendicostomy is a surgery for children who have problems with leaking of stool. *See* https://www.cincinnatichildrens.org/health/m/malone-appendicostomy (Last visited May 16, 2019).

At step three, the ALJ found that, "[a]fter careful consideration of the entire record," the plaintiff had the residual functional capacity ["RFC"] to perform light work, as defined in 20 C.F.R. § 404.1567(b), except he could never climb ladders, ropes or scaffolds; he was limited to occasionally climbing stairs and ramps, balancing, stooping and crouching; and, he should never kneel or crawl. (Tr. 20). Additionally, the ALJ stated that the plaintiff required one break every three hours, lasting two-to-three-minutes. (Tr. 20).

The ALJ concluded that, through his date last insured, the plaintiff was unable to perform any past relevant work (Tr. 23, citing 20 C.F.R. § 404.1565), but there were jobs that existed in significant numbers that the plaintiff could have performed, including the job of a laundry worker, production assembler, and small parts assembler. (Tr. 24-25). Accordingly, the ALJ found that the plaintiff was not under a disability at any time from December 29, 2014, the alleged onset date, through June 30, 2016, the date last insured. (Tr. 25, citing 20 C.F.R. § 404.1520(g)).

IV.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d

Cir. 1998) (citation omitted). "The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact." *Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citing *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.  DISCUSSION

The plaintiff contends that the ALJ erred at step four, in that the RFC failed to include any limitations resulting from the plaintiff's fecal incontinence; indeed, the ALJ failed to even mention this condition at step two. (Pl.'s Mem. at 2, 4-5). Additionally, the plaintiff argues that the ALJ failed to complete the record by not re-contacting Dr. Shumyle Alam, the plaintiff's treating physician, to discuss the details related to the frequency of the plaintiff's fecal incontinence and its impact on the plaintiff's ability to work. (Pl.'s Mem at 2, 5-6). Lastly, the plaintiff contends that the ALJ improperly evaluated his credibility in that "there is nothing in the record to detract from the credibility of [the plaintiff's] testimony." (Pl.'s Mem. at 2, 7-9).

    A.    <u>THE ALJ ERRED BOTH IN HIS CONSIDERATION OF THE PLAINTIFF'S BOWEL IMPAIRMENT AND IN HIS TREATMENT OF DR. ALAM'S OPINION</u>

The plaintiff contends that the ALJ erred in not addressing the plaintiff's bowel incontinence in step two, in failing to account for this impairment in the plaintiff's RFC, and in his assessment of the plaintiff's ability to work. (Pl.'s Mem. 2, 4-5).

At step two, the ALJ found that the plaintiff had the following severe impairments: spinal scoliosis; VATER syndrome; status post cystourethroscopy with placement of suprapubic tube; and neurogenic bladder. (Tr. 19). As the plaintiff concedes in his reply brief, VATER syndrome includes the plaintiff's bowel symptoms, and the ALJ appropriately found that the plaintiff's VATER syndrome was a severe impairment. (*See* Doc. No. 23 at 1-2; Def.'s Mem. at 3). The ALJ then concluded that the record did not contain evidence that this condition met Listing 5.06 (Inflammatory Bowel Disease). (Tr. 19-20). The ALJ went on to discuss the plaintiff's severe impairments in connection with his RFC assessment at step three.

In his analysis of the plaintiff's RFC, the ALJ noted that the plaintiff required a break every three hours "for the purpose of self-catheterization to empty his bladder[,]" and that the plaintiff explained his "significant incontinence symptoms and that he [could not] hold stool and ha[d] frequent accidents[.]" (Tr. 21). The ALJ, however, did "not credit these allegations" in light of the records from Morgan Stanley Children's Hospital of New York Presbyterian that show that "the claimant had discussions regarding bowel flushes and bladder management[,]" and "underwent surgical correction and placement of a suprapubic tube." (Tr. 22).

The records from Morgan Stanley Children's Hospital from October 2014 reflect that Dr. Alam discussed with the plaintiff his plan of care, bowel flushes, and bladder management. (Tr. 564-72). On January 22, 2015, the plaintiff underwent a cystourethroscopy and placement of a

8

suprapubic tube under the care of Dr. Alam. (Tr. 596-97, 618-19; *see also* Tr. 603-07, 620-29, 630-46). Fecal incontinence is not noted in these records.[7]

Additionally, the ALJ relied on treatment notes from Western Connecticut Health Network which, in his words, "show[] that the claimant had an infection in, or around, the catheter tube[,]" but that, "subsequent records from July 2015 show that the claimant managed his impairments with the [suprapubic] tube[,]" and that the plaintiff "performed irrigations[.]" (Tr. 22). Dr. Edward Beck, a urologist at Western Connecticut Health Network, consulted on the plaintiff's case on February 28 and March 1, 2015, after the plaintiff complained of left flank pain and fever. (Tr. 888-89). On March 1, 2015, the plaintiff was transferred to Pediatric Urology at Columbia Hospital in New York where he was admitted until March 3, 2015 for pyelonephritis (a urinary tract infection where one or both of the kidneys become infected). (*See* Tr. 647-81; Tr. 889).[8] The plaintiff was "unable to [tolerate] the catheterizations at home[,]" (Tr. 706), so, on March 26, 2015, the suprapubic tube was replaced. (Tr. 680-90, 693).

The plaintiff was readmitted on June 21, 2015 for the Mitrofanoff creation procedure.[9] (Tr. 706, 839; *see generally* Tr. 707-804, 812-71). At that time, the plaintiff reported that he was emptying his suprapubic tube every four hours. (Tr. 706, 839). The Mitrofanoff creation procedure and a Malone revision were performed on June 23, 2018 (Tr. 717-18; *see* Tr. 744), and

---

[7] Two years prior to the plaintiff's onset date of disability, the plaintiff reported to Cincinnati Children's Hospital that he was "suffering from several rectal prolapse, and fecal incontinence[,]" for which he was "doing well with rectal enemas." (Tr. 320). A Malone catheter was inserted to address his "severe rectal prolapse" and anal incontinence. (Tr. 320).

[8] The plaintiff was diagnosed with another urinary tract infection and pyelonephritis on January 5, 2017. (Tr. 57- 61). He was hospitalized overnight and then discharged the following day after his kidney function improved. (Tr. 956).

[9] A Mitrofanoff procedure involves the creation of a small channel that connects the bladder to the outside of the body. A catheter is used to empty urine from the bladder through the channel, and a one-way flap valve is used to maintain urine control. *See* https://www.columbiaurology.org/mitrofanoff-procedure (last visited May 17, 2019). A "Mitrofanoff" refers to the tunnel between the bladder and the outside of the body which is used to pass urine through a catheter. *Id.* A "Malone" refers to a catheter inserted into the bowel. *Id.*

9

while recovering, the plaintiff contracted pneumonia. (Tr. 805-11; *see* Tr. 815-16). During a physical therapy session on July 2, 2015, while still hospitalized, the plaintiff "had an accident and stooled [while] attempting to walk." (Tr. 827). Physical therapy notes on July 5, 2015 include that the plaintiff "well tolerated [the] session after having lunch[,]" and was "able to ambulate and climb stairs with [no] reports of pain." (Tr. 836). Thus, in these records, there is only one reference to incontinence.

The ALJ recited that the other treatment records "do not show any reports for problems[,] accidents or loss of ability to hold stool[,]" and that the records from the end of 2015 show a urinary tract infection, but "fail to reflect complaints for incontinence." (Tr. 22). In fact, the July 2015 notes from Dr. Alam do reflect that the doctor and the plaintiff "had a long discussion about plan of care and bowel flushes and bladder management[,]" but the specific records cited by the ALJ do not reference accidents or fecal incontinence. (Tr. 84, 897).

On July 23, 2015, the plaintiff underwent a cystoscopy through the Mitrofanoff and an endoscopy through the Malone (Tr. 900), following which he was advised to continue catherizations of the Mitrofanoff every three hours and to flush the Malone daily. (Tr. 92). On September 28, 2015, the plaintiff was diagnosed with another urinary tract infection (Tr. 926), and an ultrasound of the plaintiff's pelvis, taken on November 9, 2015, revealed "marked right-sided hydronephrosis of the right renal moiety of the horseshoe kidney." (Tr. 930-31).[10] Again, these records contain no references to fecal incontinence, or accidents.

There are, however, records mentioning bowel accidents, which the ALJ did not reference. On August 29 and October 3, 2014, Dr. Alam noted that the plaintiff is "+ [for] bowel accidents."

---

[10] The results of an abdominal x-ray, taken on April 4, 2016, revealed "retained fecal matter within the ascending colon, hepatic flexure and the transverse colon." (Tr. 75). There are no related records interpreting this finding.

10

(Tr. 525, 578). Similarly, at his October 3, 2014 visit with Dr. Alam, the doctor noted "Neurogenic bowel"[11] as one of the plaintiff's "Active Problems[.]" (Tr. 564). On March 1, 2015, when the plaintiff was being treated at Columbia for a urinary tract infection, the record reflects that he was "incontinent of stool several hours ago; irrigates with NS thru abdomen." (Tr. 657). Similarly, on July 20, 2015, Dr. Alam repeated that "Neurogenic bowel" is one of the plaintiff's "Active Problems." (Tr. 82). The ALJ referenced a portion of this record in his decision, but omitted this entry.

Accordingly, the ALJ's conclusion that these notes "do not detail any complaints for inability to hold stool or accidents[,]" is not supported by the record. (Tr. 22). The ALJ does not reference any of these entries in his decision. Indeed, though the ALJ noted that the July 20, 2015 record showed that the plaintiff's past medical history included "VATER ALL remission since 6 years age," the ALJ ignored Dr. Alam's entry in the same record that the plaintiff had a neurogenic bowel. (Tr. 82).

Though the focus of the medical records during this relevant period was on the plaintiff's multiple surgeries and infections related to his bladder issues, the records also contain references to the plaintiff's inability to hold stool. (Tr. 82, 525, 564, 578, 657). The ALJ ignored these notations and relied on the entries indicating that the plaintiff's VATER was "in remission." (Tr. 22; *see* Tr. 655). Yet, these references to "remission" are inconsistent with several other entries in the plaintiff's medical record, and the entries on August 29, 2014 and July 20, 2015 are inconsistent with other entries in the *same* records. (Tr. 82, 578). Some records reflected that the plaintiff's VATER was "in remission," whereas others referred to neurogenic bowel, fecal incontinence, and bowel accidents. Instead of attempting to reconcile this important inconsistency, the ALJ tailored

---

[11] Neurogenic bowel is the loss of normal bowel function. *See* https://www.cedars-sinai.org/health-library/diseases-and-conditions/n/neurogenic-bowel.html (last visited May 23, 2019).

11

his decision to a portion of the record, to the exclusion of the complete record. Additionally, the ALJ had the benefit of a narrative from the plaintiff's treating physician, which, when read in conjunction with the references in the record that the ALJ ignored, counter the ALJ's conclusion.

In his April 13, 2016 narrative, Dr. Alam explained that the plaintiff "has no control over his bowels" and he must rely "on enemas every day to clean . . . the stool out of the colon." (Tr. 954). Dr. Alam continued,

> Even though the enemas help, they do not always prevent him from stooling accidents. [The plaintiff] can have a bowel accident at any time as he does not have the anatomy that allows him to not only "feel" the need for a bowel movement, he also cannot control the bowel movement. When he has an accident, he needs to stop what he is doing in order to clean himself.

(Tr. 954). Dr. Alam concluded that, "[w]hen considering the amount of time [the plaintiff] requires for bathroom breaks, leaving work due to bowel accidents, appointments for all of his health care needs, or when he is ill, he would have very limited time . . . [to] accomplish anything at a job." (Tr. 955).

The ALJ accurately refers to Dr. Alam as the plaintiff's "treating physician." (Tr. 23). In fact, Dr. Alam is a specialist in pediatric urology, who has treated the plaintiff since before his onset date of disability. (Tr. 524); *see Burgess*, 537 F.3d at 129 ("the regulations require the ALJ to consider several factors[,]" including, the "'[l]ength of the treatment relationship and the frequency of examination'"; the "'[n]ature and extent of the treatment relationship'"; the "relevant evidence . . ., particularly medical signs and laboratory findings,' supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist") (quoting 20 C.F.R. § 404.1527(d)(2)(i)-(ii), (3)-(5)). The plaintiff testified that Dr. Alam treated him for both his bladder and bowel issues. (Tr. 132). The ALJ found that, "[a]lthough he is a treating physician," his opinion is only entitled to "partial weight" in that the ALJ "accept[ed] that

12

the claimant require[d] a break every three hours to self-catheter[,]" but did not accept that the plaintiff "would leave work early due to bowel accidents." (Tr. 23). The ALJ rejected this portion of Dr. Alam's opinion because, according to the ALJ, "[t]he medical records fail to show any issues with bowel accidents." (Tr. 23).

The "opinion of the treating physician is not afforded controlling weight where . . ., the treating physician issue[s] opinions that are not consistent with other substantial evidence in the record[.]" *Halloran*, 362 F.3d at 32. In this case, however, the ALJ erred in his conclusion that the "medical records fail to show any issues with bowel accidents." (Tr. 23). That error, in turn, tainted the ALJ's consideration of Dr. Alam's opinion. "Without contrary medical evidence, the ALJ could not reject this otherwise controlling opinion on what turned out to be a dispositive issue." *Samuels v. Colvin*, No. 3:11 CV 1046(JBA), 2013 WL 4776519, at *6 (D. Conn. Sept. 6, 2013).

The ALJ also erred in assigning greater weight to the opinions of the non-examining and non-treating providers. "[W]here a treating physician's opinion is not given controlling weight, the regulations direct the ALJ to explain in the decision the weight given to the opinions of the non[-]examining state agency consultants, treating sources, non[-]treating sources, and other non[-]examining sources." *Domm v. Colvin*, 579 F. App'x 27, 28 (2d Cir. 2014) (summary order) (citing 20 C.F.R. § 404.1527(e)(2)(ii)). In this case, the ALJ assigned Dr. Anita Bennett's opinion "great weight and accept[ed] that the claimant c[ould] perform light work." (Tr. 22). Dr. Bennett is a non-examining consultant, and while the defendant argues that the ALJ did not err in assigning her opinion great weight because she cited to a medical record in 2015 "that showed bladder and bowel continence[,]" (Def.'s Mem. at 6), that record is an operative report, and the references to continence were in the context of the procedure that the plaintiff underwent. (Tr. 900). Moreover,

contrary to the defendant's argument, the ALJ did not rely on Dr. Bennett's reference to continence in his decision, and it is well settled that "[a] reviewing court 'may not accept appellate counsel's post hoc rationalizations for agency action.'" *Shrack v. Astrue*, 608 F. Supp. 2d 297, 301-02 (D. Conn. 2009) (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) (quoting *Burlington Truck Lines, Inc. v. United States*, 317 U.S. 156, 168, 83 S. Ct. 239, 9 L. Ed. 2d 207 (1962)). Even if this single reference in this operative report was sufficient evidence to counter the plaintiff's treating physician's opinion, the ALJ did not assign her opinion great weight for that reason; rather, he only stated that he "accept[ed the opinion] that the claimant can perform light work." (Tr. 22); *see Hamedallah ex rel. E.B. v. Astrue,* 876 F. Supp. 2d 133, 144 (N.D.N.Y. 2012) (holding that "[s]ubsequent arguments by the Commissioner detailing the substantial evidence supporting the ALJ's decision are not a proper substitute for the ALJ engaging in the same evaluation.") (citing *Peralta v. Barnhart,* No. 04–CV–4557, 2005 WL 1527669, at *10 (E.D.N.Y. June 22, 2005)).

In his assessment of the consultative examiner's opinion, the ALJ similarly ignored references to the plaintiff's bowel issues. On March 23, 2015, Dr. Herbert W. Reiher performed a consultative examination of the plaintiff in connection with his application for benefits. (Tr. 891-94). The ALJ assigned partial weight to Dr. Reiher's opinion, stating only that Dr. Reiher "did not provide treatment to the claimant[,]"and that the ALJ "does not accept that the claimant lacks any postural restrictions[,]" as "[t]hat finding does not consider the possible impact from scoliosis." (Tr. 22).

In Dr. Reiher's March 23, 2015 report, he noted that the plaintiff has "one bowel movement a day which is formed and has occasional bowel leakage which is not significant." (Tr. 891). Even though Dr. Reiher described the plaintiff's bowel leakage as "occasional" and "not significant[,]"

14

the ALJ failed to address the reference to this issue at all. Moreover, the Second Circuit has repeatedly cautioned, "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013) (citing *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990)).

Accordingly, remand is necessary so that the ALJ may consider the treating physician opinion in light of the complete medical record.[12]

### B. ASSESSMENT OF THE PLAINTIFF'S TESTIMONY

As discussed above, the plaintiff testified at the hearing that he had made several attempts at work, but, due to his surgeries, the time-off he had taken, and the "many accidents[]" during the work day, he had not been able to hold a job. (*See* Tr. 121, 129-31). At the hearing, the ALJ posed hypotheticals to the vocational expert that accounted for the plaintiff's bowel issues, and his need to take off time. (*See* Tr. 136-39). The vocational expert testified that if a person had "unpredictable breaks" that exceeded "one or two minutes," or unpredictable absences, or if the person was off-task for ten percent of the time or his "productivity [was ten] percent or more below the expected norm because of these incidences, he would be terminated fairly quickly[.]" (Tr. 137). Additionally, work would be precluded if, in addition to being absent two days or more per month, the person was more than an hour late or needed to leave work an hour or more early, twice a month. (Tr. 139). In his decision, the ALJ considered the plaintiff's testimony that he needed time to clean himself and irrigate his colon following accidents, but then concluded that

---

[12] The plaintiff argues that the ALJ had a duty to recontact Dr. Alam. (Pl.'s Mem. at 5-7). "The duty to recontact arises only if the ALJ lacks sufficient evidence in the record to evaluate the doctor's findings[.]" *Morris v. Berryhill*, 721 F. App'x 25,28 (2d Cir. 2018) (summary order) (citations omitted). The issue in this case is not a gap in the medical records, but rather, the ALJ's disregard of relevant entries in the record that support both the plaintiff's treating physician's opinion and the plaintiff's testimony. Accordingly, the ALJ did not err in failing to recontact Dr. Alam.

his testimony about the frequency of these accidents was not consistent with the medical evidence in the record. (Tr. 21).

"It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citation and internal quotation marks omitted). The ALJ's discretion to evaluate the claimant's credibility is subject to deference "if supported by substantial evidence in the record[.]" *Suttles v. Berryhill*, 756 F. App'x 77, 78 (2d Cir. 2019) (summary order) (citing *Aponte*, 728 F.2d at 591); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). The substantial medical evidence consists of "medical signs or laboratory findings [that] show that [the claimant] [has] a medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms, . . ." and then the ALJ must "evaluate the intensity and persistence" of these symptoms so that the ALJ "can determine how [the claimant's] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). Moreover, because "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques[,]" the "intensity, persistence, and limiting effects of many symptoms can be clinically observed and recorded in the medical evidence." Social Security Ruling ["SSR"], 16-3p, 2017 WL 5180304, at *5 (S.S.A. Oct. 25, 2017).[13]

In this case, the Court has already concluded that the ALJ erred in his treatment of Dr. Alam's medical opinion. Dr. Alam, who has a long treatment history with the plaintiff, and is familiar with the plaintiff's lack of bowel control, explained in his narrative that the plaintiff "has no control over his bowels" (Tr. 954), and that, although the plaintiff's use of enemas "help[s,] . .

---

[13] SSR 16-3p applies to "determinations and decisions" made "on or after March 28, 2016. *Id.* at *1. As explained in this SSR: "When a Federal court reviews [a] final decision in a claim, . . . we expect the court to review the final decision using the rules that were in effect at the time we issued the decision under review." *Id.*

16

. they do not always prevent him from stooling accidents." (Tr. 954). Dr. Alam explained that the plaintiff "can have a bowel accident at any time[,]" and when such an accident occurs, he must "stop what he is doing in order to clean himself." (Tr. 954). Consistent with the vocational expert's opinion, Dr. Alam noted that, "[w]hen considering the amount of time [the plaintiff] requires for bathroom breaks, leaving work due to bowel accidents, appointments for all of his health care needs, or when he is ill, he would have very limited time . . . [to] accomplish anything at a job." (Tr. 955). Though the ultimate decision of whether a claimant is capable of working is reserved to the Commissioner, the ALJ erred in not considering the underlying opinion of the plaintiff's medical source, which was based on his clinical observations and treatment history, and detailed the intensity, severity and limiting effects of the plaintiff's bowel incontinence. (Tr. 23); *see* 20 C.F.R. § 404.1527(c)(2); SSR 16-3p, 2017 WL 5180304, at *5.

The ALJ's adverse credibility determination, in turn, was based on an erroneous assessment of the record. *Genier*, 606 F.3d at 50 (holding that "[b]ecause the ALJ's adverse credibility finding, which was crucial to his rejection of Genier's claim, was based on a misreading of the evidence, it did not comply with the ALJ's obligation to consider 'all of the relevant medical and other evidence,' 20 C.F.R. § 404.1545(a)(3), and cannot stand."). The ALJ concluded that the plaintiff's testimony was not consistent with the medical evidence, yet, as discussed above, the ALJ erred in his assessment of the medical evidence and in his treatment of the treating physician's opinion. Accordingly, upon remand, the ALJ shall consider the plaintiff's credibility, his testimony and his work attempts, in light of his reconsideration of the medical record and reweighing of the medical opinion evidence. The ALJ shall revisit his RFC determination after this thorough review of the entire record.

VI. CONCLUSION

Accordingly, for the reasons stated above, the plaintiff's Motion for Judgment on the Pleadings (Doc. No. 19) is *granted in large part, and the matter is remanded for consideration of the complete medical record, weighing of the medical opinion evidence in light of the complete record, and consideration of the plaintiff's credibility and RFC in light of the medical record.* The defendant's Motion to Affirm (Doc. No. 22) is *denied in large part and granted in limited part such that the ALJ did not err in failing to recontact Dr. Alam.*

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c). The Clerk's Office is instructed that, if any party appeals to this Court the decision made after this remand, any subsequent social security appeal is to be assigned to the Magistrate Judge who issued the Ruling that remanded the case.

Dated this 18th day of June, 2019 at New Haven, Connecticut.

    /s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge